IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CARI J. WROBLEWSKI,                 )
                                    )   Civil Action No. 12-0780
          Plaintiff,                )
                                    )   Judge Mark R. Hornak
          v.                        )
                                    )
OHIOPYLE TRADING POST, INC.,        )
                                    )
          Defendant.                )

## OPINION

**Mark R. Hornak, United States District Judge**

Cari Wroblewski brings suit against Ohiopyle Trading Post, Inc. ("Ohiopyle") alleging that she suffered injuries to her knee as a result of Defendant's negligence and gross negligence when she was thrown from her raft during a white water rafting trip. Ohiopyle argues that it is entitled to summary judgment because (1) Plaintiff signed a Rental Agreement which contained a provision releasing Defendant from liability ("Release") for the very claims made in this matter and (2) Defendant did not have a duty to protect Plaintiff from being thrown from a raft and striking a rock because these are inherent risks of white water rafting. These matters, having been fully briefed by the parties and oral argument having been presented, are ripe for disposition. For the reasons which follow, Ohiopyle's Motion for Summary Judgment is granted.

## I.    BACKGROUND

Cari Wroblewski was 37 years old at the time of the incident that forms the basis of this lawsuit. Wroblewski Dep. 7:4-5. She holds an associate's degree in business as well as a bachelor's degree in accounting. *Id.* at 8:18-9:19. In April 2010, two months prior to the trip at issue in this case, Plaintiff went white water rafting on the Salt River in Arizona where she

signed a rental agreement with a release and was informed that white water rafting could be dangerous and that she could fall out of the raft. *Id.* 16:21-17:7; 20:14-21:9.

One of Plaintiff's friends, Steve Rose, made arrangements to rent equipment from Ohiopyle for a rafting trip on the Youghiogheny River with a group of their friends on June 11, 2010. ECF No. 21 ¶ 2; ECF No. 25 ¶ 2. Joel Means, one of the owners of Ohiopyle, testified in his deposition that the lower section of the Youghiogheny River is considered "the intermediate white water section of the River" and consists of Class I through Class III rapids with borderline Class IV at certain levels. Means Dep. 14:8-15:1. Plaintiff had been told, not by an Ohiopyle employee but most likely by one of her friends in the group, that the rapids on the river would be mild, level two and three rapids. Wroblewski Dep. 37:6-23.[1]

On the morning of June 11, 2010, Means noticed that the river was "up and brown" from rain the night before, and that the water level had risen from 2.5 to 3.98 feet. Means Dep. 19:2-11. When the river's water level reaches four (4) feet, rafters are required by state regulations to have an experienced guide accompany them on their rafting trip.[2] *Id.* 60:3-6. Ohiopyle is permitted to provide guided white water rafting tours when the level of the river is between four (4) and ten (10) feet. ECF No. 31. Means testified that the river level being of above average flow could make the rafting trip more difficult, but that the river is more dangerous at low levels than at high levels. Means Dep. 47:18-22.

---

[1] "Q: What made you think before then that the rapids were levels two or three?
A: From what I had been told they were supposed to be rather mild rapids.
Q: Who told you that they were rather mild rapids?
A: I don't recall.
Q: It wasn't anyone from Ohiopyle Trading Post; was it?
A: No
Q: Was it one of the people in your group that went white water rafting that day?
A: Most likely." Wroblewski Dep. 37:6-23.

[2] At oral argument, Plaintiff's counsel persistently argued not that the river level actually was four (4) feet at the time at issue, but that the Court should treat it as if it were. The Court knows of no record basis to do so.

Plaintiff and her friends traveled to the Youghiogheny River for the white water rafting trip on the morning of June 11, 2010. ECF No. 21 ¶ 1; ECF No. 25 ¶ 1. Upon arriving at the River, Plaintiff went to the bathroom for "quite a while" while the rest of her group started to get their rented equipment. ECF No. 25 at 2, ¶ 1; Wroblewski Dep. 31:8-19. Means informed the rest of Plaintiff's group that the level of the river was above average flow that day and therefore the river that day was a "real white water river" and not a "float trip." Means Dep. 16:16-17. Means told Steve Rose that if he and the others in the group no longer wished to rent equipment, Ohiopyle would provide the group with a guided whitewater rafting tour at a discounted rate of $40 per person rather than the usual price of $60 per person (a non-guided rafting trip costs about $20 per person). *Id.* 38:9-14; 46:21-47:8. Plaintiff's group declined the offer of a discounted guided rafting trip. Means also instructed his employees that day to "make sure [the group understood] what game they're about to play," in reference to the river. *Id.* 39:11-15. Presumably because she was in the bathroom, Plaintiff never heard from Means his advice as to the conditions of the river or offer of a guided tour. Wroblewski Dep. 32:2-12.

When Plaintiff was finished in the bathroom, she went to get her equipment from Ohiopyle and was "in a rush" because her friends had gotten a head start. ECF No. 25 at 2, ¶¶ 2-3; Wroblewski Dep. 31:8-19. An Ohiopyle employee handed Plaintiff a Rental Agreement and told her that she "needed to sign the form and meet up with [her] group because they were getting their gear." ECF No. 25 at 2, ¶ 5; Wroblewski Dep. 76:6-21. Plaintiff testified that "[t]hey hurried me along" and she was not given an opportunity to read the Rental Agreement. Wroblewski Dep. 78:7; 76:22-23. She also testified that the Ohiopyle employee "didn't ask me to read it, they just gave it to me and said please sign this and catch up with your group, they're

already getting their stuff." *Id.* 78:3-13. Plaintiff signed Ohiopyle's Rental Agreement which included a waiver and release of liability provision ("Release"). ECF No. 19-5.[3]

After receiving her rafting equipment, Plaintiff and her group received a safety briefing by an Ohiopyle employee before being sent to the river to embark on their trip. ECF No. 25 ¶ 8; Wroblewski Dep. 32:13-16. In the safety briefing, Plaintiff was warned that white water rafting can be dangerous, and it was possible that participants could fall out of the raft. Wroblewski Dep. 33:6-12.

After rafting through the first set of river rapids, Plaintiff grew concerned that the rapids were not level two or three. *Id.* 37:6-10. Plaintiff stated that she was concerned that the river was more than she could handle, and that she considered getting off of the river but "[t]here was no place to get off." *Id.* 40:5-16. Plaintiff did not express her concerns to any others on the rafting trip. *Id.* 40:10-1. Near the end of the whitewater rafting trip, Plaintiff was thrown from the raft. ECF No. 21 ¶ 5; ECF No. 25 ¶ 5; Wroblewski Dep. 41:12-20. According to Plaintiff, she was dragged under water and struck her knee on a rock, sustaining serious injuries. ECF No. 21 ¶ 6; ECF No. 25 ¶ 6; Wroblewski Dep. 41:21-42:1.

Plaintiff filed this action against Defendant in June 2012. ECF No. 1. Defendant moved for summary judgment. ECF Nos. 19, 20, 21. Plaintiff filed her response, ECF Nos. 24, 25, and Defendant filed a reply as well as a supplement. ECF Nos. 26, 27, 31. For the reasons discussed below, Defendant's Motion for Summary Judgment is granted.

## II.    STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*

---

[3] Plaintiff was not the last person in her group to sign the Rental Agreement, as her signature is the second to last signature on the Rental Agreement. ECF No. 19-5.

*Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250 (1986).

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986); *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir.2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See id.* "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587; *Huston*, 568 F.3d at 104.

## III.  DISCUSSION

Ohiopyle advances two arguments in support of its summary judgment motion. First, Defendant submits that the Rental Agreement form signed by Plaintiff contained a valid and

enforceable release of liability in favor of Defendant, releasing Defendant from liability for the very claims made in this matter. Secondly, Defendant argues that it did not have a duty to protect Plaintiff from being thrown from a raft and striking a rock because these are inherent risks of white water rafting, and this Defendant should not have any liability.

On June 11, 2010, prior to white water rafting, Plaintiff signed a two-page document that contains a release of liability and is titled "RENTAL AGREEMENT" in capital letters at the top of its first page. ECF No. 19-5. The top half of the first page is a form to be filled out with information relating to the primary renter and the white water rafting equipment to be rented. *Id.*

The bottom half of the first page begins with the header "TERMS AND CONDITIONS," with thirteen (13) paragraphs listed in three columns under this header. *Id.* The actual language releasing Ohiopyle from liability regardless of its own negligence is listed as paragraph nine (9) in this section. *Id.* The font of the Release language is the same size as the other paragraphs listed under "TERMS AND CONDITIONS" but, unlike the other paragraphs, is written in all capital letters. *Id.* The exculpatory clause consequently falls on the bottom half of the front side of the first page, in both the left and middle columns and, by itself, makes up approximately half of the language listed under "TERMS AND CONDITIONS." *Id.*

Paragraph nine (9) contains the following language:

9.    READ CAREFULLY THE FOLLOWING WAIVER AND RELEASE OF LIABILITY:  HAVING RECEIVED A SAFETY TALK BY A MEMBER OP LESSOR'S STAFF, AND HAVING READ THE SAFETY PRECAUTIONS AND RECOMMENDATIONS ON THE REVERSE SIDE HEREOF, LESSEE(S) HEREBY ACKNOWLEDGE THAT HE/SHE/THEY FULLY UNDERSTAND(S): (a) THAT OUTDOOR RECREATIONAL ACTIVITIES HAVE INHERENT RISKS, DANGERS, AND HAZARDS, AND THAT SUCH EXISTS IN MY USE OF THE EQUIPMENT ABOVE DESCRIBED AND MY PARTICIPATION IN WHITE WATER RAFTING AND RELATED ACTIVITIES; (b) THAT MY PARTICIPATION IN SUCH ACTIVITIES AND/OR THE USE OF SUCH EQUIPMENT MAY RESULT IN INJURY OR ILLNESS, INCLUDING, BUT NOT LIMITED TO, BODILY INJURY,

DISEASE, STRAINS, FRACTURES, PARTIAL AND OR TOTAL PARALYSIS, DEATH, OR OTHER AILMENTS THAT COULD CAUSE SERIOUS DISABILITY; (c) THAT SAID RISKS AND DANGERS MAY BE CAUSED BY (i) THE NEGLIGENCE OF THE OWNERS, EMPLOYEES, OFFICERS, OR AGENTS OF LESSOR, (ii) THE NEGLIGENCE OF PARTICIPANTS, (iii) THE NEGLIGENCE OF OTHERS, (iv) ACCIDENTS, (v) BREACHES OF CONTRACT, AND (vi) THE FORCES OF NATURE OR OTHER CAUSES; (d) THAT RISKS AND DANGERS MAY ARISE FROM FORESEEABLE OR UNFORESEEABLE CAUSES, INCLUDING, BUT NOT LIMITED TO, GUIDE DECISION MAKING, INCLUDING THAT A GUIDE MAY MISJUDGE TERRAIN, WEATHER, TRAIL OR RIVER ROUTE LOCATION; WATER LEVEL; FALLING OUT OF OR DROWNING WHILE IN A RAFT, CANOE, OR KAYAK; AND SUCH OTHER RISKS, HAZARDS. AND DANGERS THAT ARE INTEGRAL TO RECREATIONAL ACTIVITIES THAT TAKE PLACE IN A WILDERNESS, OUTDOOR OR RECREATIONAL ENVIRONMENT; AND (e) THAT BY MY PARTICIPATION IN THESE ACTIVITIES AND/OR USE OF THE EQUIPMENT ABOVE DESCRIBED, I HEREBY ASSUME ALL RISKS, DANGERS, AND RESPONSIBILITY FOR ANY LOSSES AND/OR DANGERS, WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR OTHER CONDUCT OF THE OWNERS, AGENTS, OR EMPLOYEES OF LESSOR OR ANY OTHER PERSON.

AND FURTHER, ON BEHALF OF MY PERSONAL REPRESENTATIVES, SUCCESSORS, HEIRS, AND ASSIGNS, I DO HEREBY VOLUNTARILY AGREE TO RELEASE, WAIVE, DISCHARGE, HOLD HARMLESS, DEFEND, AND INDEMNIFY LESSOR AND ITS OWNERS, AGENTS, OFFICERS, AND EMPLOYEES FROM ANY AND ALL CLAIMS, ACTIONS, OR LOSSES FOR BODILY INJURY, PROPERTY DAMAGE, WRONGFUL DEATH, LOSS OF SERVICES, OR OTHERWISE WHICH MAY ARISE OUT OF MY USE OF THE EQUIPMENT ABOVE DESCRIBED, OR MY PARTICIPATION IN ANY ACTIVITIES INVOLVING SAID EQUIPMENT. I SPECIFICALLY UNDERSTAND THAT I AM RELEASING, DISCHARGING, AND WAIVING ANY CLAIMS OR ACTIONS THAT I MAY HAVE PRESENTLY OR IN THE FUTURE FOR THE NEGLIGENT ACTS OR OTHER CONDUCT BY THE OWNERS, AGENTS, OFFICERS, OR EMPLOYEES OF LESSOR.

I HAVE READ THE ABOVE WAIVER AND RELEASE, AND, BY SIGNING THIS RENTAL AGREEMENT, AGREE THAT IT IS MY INTENTION TO EXEMPT AND RELIEVE LESSOR AND ITS OWNERS, AGENTS, OFFICERS, AND EMPLOYEES FROM LIABILITY FOR PERSONAL INJURY, PROPERTY DAMAGE, OR WRONGFUL DEATH CAUSED BY NEGLIGENCE OR ANY OTHER CAUSE.

*Id.*

At the end of the "TERMS AND CONDITIONS" section, at the beginning of the right

column, is the following language:

> IN WITNESS WEREOF, and intending to be legally bound hereby, the undersigned Lessee(s) hereby certify that he/she/they have read and understood the terms and conditions of this Rental Agreement, and has/have affixed his/her/their hand(s) and seal(s) hereto on the dated indicated.

*Id.* Directly underneath this language, and in the column next to the exculpatory clause, multiple lines were provided where Plaintiff and the members of her party signed their names. *Id.* Plaintiff's signature is the second to last signature listed on the form. *Id.*

The second page of the Rental Agreement has two sections. *Id.* The first section includes the header "SAFETY PRECAUTIONS" and the second section is titled "RECOMMENDATIONS." *Id.* Both sections list a number of precautions and recommendations for how white water rafters should conduct themselves while on the river. *Id.*

The Defendant argues that the Release contained in the Rental Agreement is valid and enforceable. ECF Nos. 19, 20, 26. Plaintiff on the other hand asserts that the Release is unenforceable because its language is not sufficiently conspicuous to alert a party that it serves to release Defendant from liability and that Plaintiff did not actually assent to the terms of the Rental Agreement. ECF No. 24. To support her contentions, Plaintiff points out that the document was titled "Rental Agreement" and therefore does not provide adequate notice to signors that it is a release of liability. *Id.* at 7-8. Furthermore, the exculpatory language is placed at the bottom left of the form and not directly above the signature line, is written in small font, and does not appear until paragraph 9 of the form. *Id.* Plaintiff also argues that no one specifically informed her that she was entering into a contract that would affect her legal rights, and that she was "rushed along" by Defendant's employees. *Id.*

The parties agree that this Court must consider Pennsylvania law and apply it in this case. *See Lin v. Spring Mountain Adventures, Inc.*, 2010 WL 5257648, at *3 (E.D. Pa. Dec. 23, 2010).

Applying Pennsylvania law, the Pennsylvania Supreme Court explained that:

> It is generally accepted that an exculpatory clause is valid where three conditions are met. First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion. . . . once an exculpatory clause is determined to be valid, it will, nevertheless, still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence. In interpreting such clauses we listed as guiding standards that: 1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing the immunity is upon the party invoking protection under the clause.

*Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1189 (Pa. 2010) (citations omitted).

Plaintiff primarily relies on three release of liability cases to support her contention that the Release is in this instance unenforceable: *Beck-Hummel v. Ski Shawnee, Inc.*, 902 A.2d 1266 (Pa. Super. Ct. 2006); *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174 (Pa. 2010), and *Lin v. Spring Mountain Adventures, Inc.*, No. 10-333, 2010 WL 5257648 (E.D. Pa. Dec. 23, 2010).[4]

In *Beck-Hummel*, the plaintiff brought a negligence claim for injuries she received from colliding with a barrier wall while snow tubing at the defendant's resort. 902 A.2d 1266. There, the release was printed on the backside of a lift ticket that the plaintiff's husband purchased and had given to plaintiff. *Id.* at 1267, 1270-71. The release contained hard to read and inconspicuous language, it did not require a signature or acknowledgment, and was printed on the portion of the ticket that would be folded out of sight of the user. *Id.* at 1269, 1273-1274. The record also revealed the lift ticket was not given to the Plaintiff directly by the operator. The Pennsylvania Superior Court held that plaintiff's assent to the terms of the disclaimer was not clearly

---

[4] Plaintiff does not argue that the release in this instance is facially invalid.

established and therefore it could not hold as a matter of law that the release for snow tubing injuries was enforceable. *Id.* at 1275.

In *Chepkevich*, plaintiff skier, who had signed a release prior to skiing, asked a lift operator to stop a lift so that she and her 6-year-old nephew could board the lift. Although the lift operator agreed to do so, when the lift came behind the plaintiff and her nephew, the operator failed to stop the lift. The skier sued the ski resort for negligence for injuries she received as a result of falling from the ski lift. The release in this case was printed on a single page and titled "RELEASE FROM LIABILITY." 2 A.3d at 1192. The language releasing liability was in the same font as the rest of the release, included the term "negligence", and "specifically noted that riding the ski lift is a risky activity." *Id.* The plaintiff argued that she did not read the exculpatory language nor did anyone orally inform her that she was entering into such an agreement. *Id.* at 1180-81. The court held that the release was valid, enforceable, and "clearly encompassed the risk at issue . . . [and] clearly spelled out the parties' intention to release [defendant] from liability for injuries . . . regardless of any negligence on the part of the [defendant]." *Id.* at 1195. The court therefore upheld the grant of summary judgment in favor of the defendant. *Id.*

Finally in *Lin*, the plaintiff sued for serious injuries sustained from skiing when she lost control and fell into a snow making machine that was not properly padded. The document containing the release provision was titled "EQUIPMENT RENTAL FORM AND RELEASE FROM LIABILITY." 2010 WL 5257648, at *2. On the front page of the release was a capitalized, blocked section in the center of the page, above the signature line, instructing the reader to "PLEASE READ THE AGREEMENT ON THE BACK OF THIS FORM BEFORE SIGNING. IT RELEASES U.S. FROM CERTAIN LIABILITY." *Id.* Directly between the instruction to read the back of the release and the signature line was the following statement: "I,

the undersigned, have carefully read and understood the Acceptance of Risk and Liability Release on the back of this paper." *Id.* The exculpatory clause was located on the back of the form and stated multiple times that it was a release from liability. *Id.* at *2. The court found that even though the plaintiff had not read the release language, that she "was a voluntary signatory to a full-sized contract." *Id.* at *5. The court held that the exculpatory clause was enforceable and granted defendant's motion for summary judgment. *Id.* at *9.

This case is not analogous to *Beck-Hummel*, as Plaintiff contends. Unlike *Beck-Hummel*, Plaintiff "was not a mere recipient of a release printed on a ticket, but was a voluntary signatory to a full-sized contract." *Lin*, 2010 WL 5257648, at *5. Plaintiff signed the Rental Agreement herself, and her signature is immediately preceded by instructions guiding her to read the entirety of the form and confirming that she had done so. Moreover, Plaintiff was provided a full-sized contract in which the Release was set forth on its front side, as opposed to a small unreadable ticket that she did not sign and in which the operative language was written on the reverse side.

Moreover, the language of the Release, construed strictly against Defendant, plainly expresses the intention of the parties to release Defendant from liability for future injury. The paragraph mentions "negligence" five (5) times and that it is a release of liability three (3) times. ECF No. 19-5.[5] Specifically, the first sentence of paragraph 9 asks the signer to carefully read the "WAIVER AND RELEASE OF LIABILITY." *Id.*

Part of Plaintiff's argument is that she was not personally informed by Ohiopyle of the elevated water level prior to her signing the Rental Agreement. However, the language of the Release explicitly warned of the same things that Defendant's employees cautioned the rest of

---

[5] In fact, exculpatory clauses may bar suits based on negligence even where the clause does not specifically mention the word "negligence" at all. *Chepkevich*, 2 A.3d at 1193. "It strains common sense to suggest that releases that fail to mention the word 'negligence' should consistently be interpreted as barring suits based on negligence claims, while a release that clearly states that suits are barred 'regardless of negligence' would not bar such suits." *Id.*

Plaintiff's group. Specially, the Release warns of "bodily injury" from "risks and dangers [that] may arise from foreseeable or unforeseeable causes, including . . . water level" and "falling out of . . . a raft." *Id.* Furthermore, the clause stated that by signing the agreement, the signor "assume[s] all risks, dangers, and responsibility for any losses and/or dangers." *Id.* In fact, the clause even warns of "total paralysis" and "death." *Id.* This paragraph goes on to explain that the signor "specifically understand[s] that I am releasing, discharging, and waiving any claims or actions that I may have presently or in the future for the negligent acts or other conduct by" the Defendant. *Id.* Furthermore, "it is my intention to exempt and relieve lessor . . . from liability for personal injury . . . caused by negligence." *Id.* It is also important to note that prior to her trip to Ohiopyle, Plaintiff admittedly went white water rafting in Arizona where she signed a rental agreement with a release, and was informed that white water rafting could be dangerous and that she could fall out of the raft. Wroblewski Dep. 16:21-17:7; 20:14-21:9. Moreover, in Ohiopyle's safety briefing, right before Plaintiff boarded the raft, Plaintiff and her group were warned that white water rafting can be dangerous, and it was possible that she could fall out of the raft. *Id.* 33:6-12.

The fact that the exculpatory language was contained in the bottom half of the first page, not listed until paragraph 9, and not directly above the signature line does not make it unenforceable, either generally or in this case. While the terms and conditions are in a slightly smaller font than the upper half of the form, they are still clearly readable. Moreover, paragraph 9 is the only paragraph written entirely in capital letters. Taken as a whole, using a strict (but common sense) interpretation, it is clear the form in question releases the Defendant from liability for injuries such as those sustained by Plaintiff, even if due to Defendant's own

negligence.[6]

Plaintiff contends that summary judgment is also improper because whether she knowingly signed the Rental Agreement and assented to its terms is a question of fact for the jury. ECF No. 24. Plaintiff argues that she did not read the Release and that employees of Defendant did not directly warn or advise her as to the conditions of the river or offer her a guided tour, nor did they orally inform her of what the form stated or ask her to read the form, and that they rushed and "hurried [her] along", and therefore she did not assent to the terms of the agreement. *Id.*

Plaintiff voluntarily chose to engage in the sport of white water rafting purely for recreational purposes. Plaintiff signed the Release; she was not compelled, as a legal matter, to sign it, but chose to sign it so that she could go on the white water rafting trip with her group. *See Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1197 (Pa. 2012) ("[R]ecreational sporting activities may be viewed differently in the context of exculpatory agreements, as each party is free to participate, or not, in the activity, and, therefore, is free to sign, or not, the release form."); *see also Chepkevich*, 2 A.3d 1174 (release enforceable even though plaintiff had not read agreement); *Lin*, 2010 WL 5257648 (same). There is no evidence that plaintiff sought to negotiate the terms of the Release or asked for additional time to read it, and to the extent she was "compelled" it was a compulsion arising solely from her personal desire to meet up with her group.

---

[6] *Lahey v. Covington*, 964 F. Supp. 1440, 1442 (D. Colo. 1996) is factually similar to this case in that there, the defendant failed to personally inform plaintiff of heightened water level when the plaintiff took a white water rafting trip through defendant's company. The Arkansas Headwater Recreation Area, a white water rafting regulatory group, recommended against any rafting when the water flow measured 4.0 feet high or more (the same cut-off measurement for rafts without guides at Ohiopyle). The defendant also had a company policy to not take people rafting when the water was four feet or higher. On the day in question, the river measured 3.8 feet but, similar to this case, the defendant did not inform the plaintiff that the water level was "high" that day. Plaintiff signed a release of liability agreement prior to the trip and was injured after being tossed into the river. The court held that the exculpatory portion of the release agreement was valid and granted defendant's motion for summary judgment on plaintiff's negligence claim. *Id.* at 1446.

Under Pennsylvania law, the failure to read a contract does not nullify the contract's validity. *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983) ("[I]n the absence of proof of fraud, failure to read [the contract] is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof."); *see also Arce v. U-Pull-It Auto Parts, Inc.*, No. 06-5593, 2008 WL 375159, at *5-9 (E.D. Pa. Feb. 11, 2008) (written release found to be enforceable even when the agreement was in English but the plaintiff only read and spoke Spanish, noting that the "[p]laintiff cannot argue that the release language was inconspicuous or somehow hidden from his attention. . . . Nor did Defendant have an obligation to verify that [p]laintiff had read and fully understood the terms of the document before he signed his name to it."). [7]

This rule has been applied time and again in the context of recreational activities in which a party signed a pre-injury release of liability. For instance, the Pennsylvania Superior Court affirmed an order granting summary judgment in favor of the owner of a racetrack where the plaintiff had signed an agreement releasing all claims against the racetrack before he was injured. *Seaton v. E. Windsor Speedway, Inc.*, 582 A.2d 1380 (Pa. Super. Ct. 1990). The Superior Court held that the signed release was enforceable even though plaintiff claimed that he had not read it, did not know that he was signing a release, and did not have time to read the document because of a long line of people behind him. *Id.* at 1383 ("His explanation that he did not read it does not, in the absence of fraud or a confidential relationship, extricate him from its operation."). *See also Lin*, 2010 WL 5257648, at *6 ("[i]t is a well established rule under Pennsylvania law that failure to read a contract does not relieve a party of their obligation under such contract that they sign, and such parties will be bound by the agreement without regard to whether the terms were read

---

[7] *See also In re Greenfield Estate,* 14 Pa. 489, 496 (Pa. 1850) ("[I]f a party, who can read . . . will not read a deed put before him for execution; or if, being unable to read, will not demand to have it read or explained to him, he is guilty of supine negligence, which . . . is not the subject of protection, either in equity or at law.").

and fully understood."); *Martinez v. Skirmish, U.S.A., Inc.*, No. 07-5003, 2009 WL 1676144, *7 (E.D. Pa. June 15, 2009) (release enforceable as to negligence for injury to plaintiff during paintball game, noting that plaintiff was accompanied by friends "who could have explained the Waiver & Release to him, if he had asked them to do so. . . . Consequently, [plaintiff's] failure to read that document cannot constitute a defense to the enforceability of the Waiver & Release."); *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F. Supp. 1169, 1174-75 (E.D. Pa. 1990) (release that plaintiff signed before being injured while racing all-terrain vehicle was enforceable even though plaintiff failed to read it because "[t]o accept plaintiff's argument that there is such a duty [on the part of the defendant] to inform in this case would essentially abrogate the law of Pennsylvania regarding plaintiff's duty to read.").[8]

Similar to the cases discussed above, Plaintiff voluntarily participated in the white water rafting trip. "The signer is under no compulsion, economic or otherwise, to participate, much less to sign the exculpatory agreement, because it does not relate to essential services, but merely governs a voluntary recreational activity." *Chepkevich*, 2 A.3d at 1191. Plaintiff could have requested additional time to read the agreement, or she could have chosen to not sign the Release and not go white water rafting. *See Martinez*, 2009 WL 1676144, at *7 (argument that plaintiff had no choice but to sign release because he had pre-paid for the paintball activity was unavailing for the reason that it was a recreational activity where participation was voluntary). Holding that Defendant had a duty to orally inform Plaintiff of what she was signing, or holding

---

[8] In *Doe v. Cultural Care, Inc.*, No. 10-11426-DJC, 2011 WL 1048624, at *4-5 (D. Mass. Mar. 17, 2011), the court held that a release signed by plaintiff was enforceable even if the defendant had rushed her. There, the court explained that

> "[t]he fact that [plaintiff] did not take the time to read the terms and conditions of the Agreement because she felt hurried by [defendant] does not change the analysis. [Plaintiff] does not dispute that she executed the Agreement or that it contains the Release. She disputes that she agreed to the terms and conditions, that the Release discharges Defendants from liability or bars her claims since she had no knowledge of the Release and was rushed into executing the Agreement based on Defendants' representations."

*Id.*

a release unenforceable because Plaintiff failed to read the contract containing a release of liability she signed because she felt rushed, would turn this rule on its head.

The Court considers, as it must, all of the relevant circumstances set out in the record, *Lin*, 2010 WL 5257648, at *6, and is unable to agree with Plaintiff that the Rental Agreement constituted (as a matter of law) an insufficient effort on the part of Ohiopyle to inform her of the fact that by signing that Agreement, she was giving up any right she might have to sue for damages arising from injuries caused even by negligence. In five (5) different places the Release mentions "negligence" and states that is a release of liability in three (3) places. ECF 19-5. Similar to *Chepkevich*, "[a]lthough the outcome in this case was certainly unfortunate, the risk was not so unexpected, or brought about in so strange a manner, as to justify placing this injury beyond the reach of the plain language of the Release, which specifically noted" that white water rafting is a risky activity in which water levels can increase or decrease and that you can fall out of the raft. *Chepkevich*, 2 A.3d 1174, 1194. Furthermore, between her previous white water rafting trip in Arizona and the safety briefing she was admittedly provided by Ohiopyle, Plaintiff was aware that white water rafting was dangerous and that falling out of a raft was an actual danger of the activity. Moreover, Plaintiff's argument that there is an issue of material fact as to whether she assented to the terms of the agreement because she felt "rushed" by Defendant, is insufficient to deem the agreement unenforceable in light of her duty under Pennsylvania law to read a contract.

The Release, even when construed against Defendant, clearly spelled out the parties' intention to release Defendant from liability and encompassed the risk of varying water levels and falling out of the raft. Consequently, the Release meets the enforceability test under Pennsylvania law. Plaintiff brings a claim for negligence. Negligence is explicitly encompassed

within the Release, and Defendant's Motion for Summary Judgment is granted.[9]

IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: August 22, 2013

cc:     All counsel of record

---

[9] Because the signed Rental Agreement precludes Plaintiff from bringing a claim of negligence against Defendant, the Court need not decide whether the incident at issue in this case was an inherent risk of white water rafting.